**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| NICHOLAS DAMANULE DANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:15-cv-04187-NKL |
| | ) | |
| CITY OF COLUMBIA, MISSOURI, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Nicholas Daniels has sued a number of Columbia police officers for allegedly violating his federal constitutional rights when they arrested him at the Fieldhouse on October 23, 2013. He also filed claims for state law violations. The defendant police officers and the City of Columbia argue that there is insufficient evidence to show any violation of the U.S. Constitution or state law, and even if there is such evidence, the defendant officers are entitled to either qualified or official immunity. Therefore, the Defendants argue a judgment should be entered in their favor.

At this stage of the litigation, the Court's sole role is to determine whether there is evidence that the Defendants violated Mr. Daniels' constitutional rights. If such evidence has been presented, the Court must then determine whether an objective police officer in the same circumstances would understand that his or her actions violated the U.S. Constitution. Unless a court has previously found a constitutional violation involving similar facts, the police are not on notice that their actions violate the Constitution. When notice is lacking, the police are entitled to qualified immunity even if a constitutional violation occurred.

In short, the Court does not sit as a super-personnel board to determine whether defendants acted professionally or reflected the expectations of the community. Rather, the Court's job is to follow the law outlined above, as interpreted by the United States Supreme Court.

Given these limitations, the Court finds that Summary Judgment should be granted to all the Defendants on Mr. Daniels' federal claims. The Court exercises its discretion to dismiss the state claims without prejudice, meaning they can be refiled in state court.

## I.   Undisputed Facts[1]

On the evening of October 23, 2013, Officers Terranova and Corcoran were conducting a routine business check at the Fieldhouse, a bar in downtown Columbia. [Doc. 54, p. 8]. Near the same time, Officers German and Sinclair separately entered the Fieldhouse for a walkthrough. [Doc. 54, p. 8].

The Fieldhouse was dimly lit and in some places was crowded that evening. [Doc. 70, p. 53-54; Exhibit I at 1:11]. Loud music played over the speaker system. [Doc. 70, p. 53-54; Exhibit I at 1:11].

Plaintiff, Nicholas Daniels, an African American man, was at the Fieldhouse when the police entered. Daniels was a football coach at Lincoln University and weighed approximately 230 pounds. [Doc. 54, p. 5 and p. 43].

---

[1] The facts are viewed in the light most favorable to Daniels if there is a dispute. For there to be a dispute, there must be admissible evidence to support each party's version of the facts. Statements by lawyers are not evidence. Furthermore, the facts must be material. There may be many disputed facts in a case, but if they are not relevant to the legal elements of the claims or defenses, they cannot be the basis for denying summary judgment. When there is a videotape of the incident and the parties do not object to the admissibility of the tape, the Court must "view[] the facts in the light depicted by the videotape," when possible. *Ransom v. Grisafe*, 790 F.3d 804, 807 (8th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)). Here, there is video tape footage of the incident and neither side has objected to it.

2

Brock Gettemeier, a tall white man, was working as a Fieldhouse bouncer that night. [Doc. 54, p. 15]. Gettemeier wore his black Fieldhouse shirt, which said "The Fieldhouse" in yellow print on the front. [Doc. 54, p. 15].

As Terranova checked the identification of several women, Corcoran approached Gettemeier and yelled into his ear, "Just a head's up—there's some real players in here. There's probably a gun or two in here tonight." [Doc. 70, p. 51-2; Exhibit I at 2:13 and 3:30].

Terranova and Corcoran then continued their walk through the bar. [Exhibit I at 3:38]. As Corcoran followed Terranova toward the front of the bar, he stopped, grabbed Terranova's shoulder and said, "Watch this guy. He's coming around the corner, man." [Exhibit I at 4:25]. They then saw Brock Gettemeier, the Fieldhouse bouncer, having a physical confrontation with Daniels. [Doc. 54, p. 22]. Corcoran and Terranova moved toward them shouting, "Hey! Police, police, police!" [Doc. 70, p. 64; Exhibit I at 4:33]. As Gettemeier and Daniels went into the second dance floor area, Daniels reached up toward Gettemeier's neck.[2] [Doc. 54, p. 22; Exhibit I at 4:31-4:34]. As Terranova and Corcoran closed the distance with Daniels and Gettemeier,

---

[2] Defendant's Statement of Facts cites to Corcoran's deposition in which he testified, "I saw Mr. Daniels reaching up towards Mr. Gettemeier's neck." [Docs. 54, p. 22; 39-5, p. 10 of 48]. In response, Daniels cites to a completely unrelated fact. Daniels states:

"DENY Officer Corcoran saw 'Mr. Daniels reaching up towards Mr. Gettemeier's neck' at any time before watching his body camera footage after depositions began in this case. Officer Corcoran did not note any such occurrence in his initial police report. PASF at ¶ 86."

In support of his denial, Daniels cites to paragraph 86 of his own statement of facts ("PASF") which states:

"86. Mr. Gettemeier never told Mr. Daniels he had to leave or that he was trespassing. Defendants' Exhibit G at Page 53, Line 13."

[Doc. 70, p. 63, ¶ 86]. Defendants' Exhibit G at Page 53, Line 13, is Gettemeier's deposition in which Gettemeier states:

"I was at the head door that night, so yeah. I checked his I.D. I mean, I don't remember him specifically from it." [Doc. 39-7, p. 53 of 75].

These cited facts are entirely unrelated to Defendant Corcoran's statement that he saw Daniels reach up toward Gettemeier's neck. Thus, there is no evidence before the Court to support even the inference that Daniels did not reach toward Gettemeier's neck. The plaintiff's attempt to deny a fact without citing to any evidence from the record that supports his denial does not make a fact disputed.

3

Daniels was trying to choke Gettemeier.[3]  [Doc. 54, p. 24, ¶ 73].  Upon approaching, Corcoran

grabbed Gettemeier's shoulder.  [Exhibit I at 4:33-4:34].  During the altercation, Daniels heard

officers yell, "Freeze" and "Get down."[4]  [Doc. 54, p. 35, ¶ 125; Doc. 39-1, p. 63 of 202; Exhibit

---

[3] Defendants' statement of facts states:

> "Once Officer Corcoran closed the distance with Mr. Daniels, [sic] Mr. Gettemeier, he
> again observed Mr. Daniels chocking [sic] Mr. Gettemeier.  Exhibit I at 4:33.27-4:33.4;
> Defendants' Exhibit E at p. 106, line 21-p. 108, line 6.  This was the second instance that
> Officer Corcoran observed Mr. Daniels choking Mr. Gettemeier.  Defendants' Exhibit E
> at p. 107, line 20-p. 108, line 6; see also Exhibit S, a screenshot depicting Mr. Daniels
> choking Mr. Gettemeier in Exhibit I at 4.33.4[.]"

[Doc. 54, p. 24, ¶ 73].  Defendants' citation to Corcoran's deposition, "Exhibit E," is sufficient evidence
to support this fact because Corcoran testified:

> Q:  Now, has it always been your memory that Mr. Daniels was trying to choke Mr.
> Gettemeier before any of this comes into frame?"
> A:  Yes.

[Doc. 39-5 p. 106 line 21-p.108, line 6].
Daniels attempts to dispute this fact by stating:

> "DENY.  Officers Corcoran and Terranova only had a belief Mr. Gettemeier was
> attempting to eject Mr. Daniels from the Fieldhouse.  PASF at ¶ 83-96."

aniels' statement that the officers "only had a belief Mr. Gettemeier was attempting to eject Mr. Daniels
from the Fieldhouse" does not address the fact at issue: that Daniels was trying to choke Gettemeier.
Without a direct denial, much less a direct denial supported with evidence from the record, a fact is not
disputed.

    None of Daniel's citations to the record—his own statement of facts at ¶ 83-96—directly denies
that Daniels tried to choke Gettemeier.  Instead, Daniels' cited facts are unrelated to this issue.  Beginning
with paragraph 91 through 96, Daniels' facts address the events chronologically that occurred *after* the
specific moment at issue when Terranova and Corcoran closed the distance to Daniels and Gettemeier and
saw Daniels trying to choke Gettemeier.  [Doc. 70, p. 65-68, ¶ 91-96].  Therefore, Daniels citations to ¶
91-96 are irrelevant and do not make this fact disputed.  As to Daniels' cited paragraphs 83-91, none of
these alleged facts address whether Daniels did or did not try to choke Gettemeier.  [Doc. 70, p. 60-65, ¶
83-90].  Instead, these facts involve tangential allegations about Gettemeier's actions, as well as other
irrelevant facts, including that Gettemeier never told Daniels he had to leave or that he was trespassing.
[Doc. 70, p. 62-65].  Without any evidence to even infer that Daniels did not try to choke Gettemeier, the
Court must accept this fact as true and undisputed.

[4] Defendants' Statement of Facts states, "As Mr. Daniels was engaged with Mr. Gettemeier and sliding
across the Fieldhouse's floor, he could hear police officer [sic] saying, 'freeze and get down.'"  [Doc. 54,
p. 35].  To support this fact, Defendants cite to Daniels' deposition in which he testified:

> Q:  Okay. After you were grabbed and lifted, when is the first time that you noticed a
> police officer in the area?
> A: Well, when I was grabbed and lifted, and I was slid across the floor, all I could hear is
> people screaming.  All I could hear is the cops saying, freeze.  And get down."

In response, Daniels attempts to challenge this statement but does not cite to any evidence and only states:

> "DENY he could hear police officer saying, 'freeze and get down.' Exhibit I at ___." "

[Doc. 54, p. 35].  Not only does Daniels fail to support this denial with any evidence, but Daniels
admitted this fact in his deposition, which Defendants cited.  Therefore, this fact is undisputed.

4

M at 2:52]. Corcoran ordered Daniels to get on the ground, but he did not get on the ground. [Doc. 54, p. 25].[5]

Corcoran then pulled Daniels' left arm slightly down, but Daniels forced it back up level with his head and again spread his fingers to display his palm. [Exhibit H at 3:48-50; Doc. 54, p. 24]. During these few seconds, German had also reached the altercation. [Exhibit H at 3:48]. With Corcoran still on Daniels' left side as he was pulling down Daniels' left arm, German faced Daniels and yelled in his face, "Put your hands behind your back! Put your hands behind your back!" [Exhibit H at 3:48-3:53]. Daniels' arms remained raised above his head. [Exhibit H at 3:48-3:53].

During this time, Corcoran and Terranova punched Daniels several times, struck him in the knee, and attempted to sweep his legs out from under him; Daniels did not get on the ground or put his arms behind his back. [Docs. 70, p. 67; 39-1, p. 73]. At the same time that German reached the altercation and ordered Daniels to put his hands behind his back, Sinclair reached the altercation coming up right behind her. [Exhibit H at 3:53]. Upon reaching the group, Sinclair grabbed Gettemeier and pulled him away from the altercation, yelling, "Get back, get back, get back!" at Gettemeier. [Exhibit H at 3:55]. Immediately after, as Sinclair turned back toward Daniels and the other officers, Sinclair was punched in the face. [Exhibit H at 3:57]. Sinclair

_____

[5] Daniels directly denies this fact as follows:
> "DENY. Officer Corcoran never told Mr. Daniels to put his hands behind his back or get on the ground. Rather, upon approaching Mr. Daniels and Mr. Gettemeier, Officers Terranova and Corcoran immediately began punching, kicking, kneeing, and tripping Mr. Daniels. PASF at ¶ 83-96."

[Doc. 54, p. 24-25]. However, Daniels cites to his own statement of facts, paragraphs 83-96, but none of the cited facts addresses whether Corcoran did or did not order Daniels to get on the ground. The Court is without evidence even to infer that Corcoran did not order Daniels to get on the ground. Therefore, this fact is undisputed.

perceived[6] that he was punched by Daniels, but Daniels did not punch him.  [Doc. 54, p. 33, ¶ 111].

Shortly thereafter, Daniels broke away from the altercation with his hands at his sides. [Doc. 70, p. 73; Exhibit H at 4:00].  As Daniels began walking away from the officers, Terranova put his hands on Daniels' shoulders.  [Exhibit H at 4:01].  Sinclair then raised his Taser, and shouted "Taser, Taser, Taser!"  [Exhibit H at 4:02].  As Terranova released his grip on Daniels, Sinclair's Taser fired once into Daniels' back. [Exhibit H at 4:02-04; Doc. 54, p. 34].  As the Taser fired, Corcoran pulled Daniels' legs out from under him, and Daniels fell to the ground. [Exhibit H at 4:04; Doc. 70, p. 71].

Once Daniels was on the floor, he rolled onto his back and did not comply with the officers' orders to roll onto his stomach.  [Doc. 54, p. 26].  At first, Terranova and Corcoran were unable to turn Daniels onto his stomach to handcuff him.  [Docs. 39-19, p. 2; 54, p. 26].  Once Terranova and Corcoran did manage to turn him over onto his stomach, they pulled his hands behind his back and placed them in handcuffs.[7]  [Docs. 39-19, p. 2; 54, p. 26].  At the police car, Daniels was told he had been arrested.  [Doc. 70, p. 77; Exhibit H at 7:52].

---

[6] During Defendant Sinclair's deposition, Plaintiff's counsel asked, "Your belief that night was Mr. Daniels struck you?" to which Sinclair responded, "Yes."  [Doc. 39-4, p. 85 of 239].  In response, Daniels challenges this fact by stating that Officer Sinclair testified, "I never saw him punch anyone" and "I was looking right at Mr. Daniels." However, Daniels fails to provide any citation to the record to support these statements he alleges were made by Sinclair.  Furthermore, the Court is unable to locate these alleged statements anywhere in Sinclair's deposition.  Therefore, the Court cannot infer that Sinclair ever said this.

In addition, Daniels again cites to his own statement of facts, paragraphs 97-106.  [*Id.*]  None of the cited facts that are properly supported by the record directly dispute Sinclair's perception that Daniels punched him in the face.  Therefore, Sinclair's perception of the punch coming from Daniels is an undisputed fact.

[7] Each officer perceived that Daniels flexed his muscles and physically resisted their efforts during the encounter.  Daniels testified that he was unsure whether he maintained tension in his arms the entire time the officers had contact with him.  [Doc. 54, p. 37].  Equivocal statements do not create disputed facts. *See, e.g.*, *Bosley v. Cargill Meat Sols. Corp.*, 705 F.3d 777, 782 (8th Cir. 2013) ("An assertion that a party does not recall an event does not itself create a question of material fact about whether the event did, in fact, occur.") (internal quotations omitted).

The officers did not record a statement about the incident from Gettemeier or any witnesses, before deciding to arrest Daniels. [Doc. 70, p. 81]. The officers did not arrest Gettemeier.

After Daniels was driven to the Boone County Jail, Sergeant Cornman interviewed him about the incident as part of her use of force investigation. [Doc. 70, p. 83-84; Exhibit M]. During the video-recorded interview, Daniels indicated that he could feel soreness near his armpit on the side of his body. [Doc. 54, p. 44]. He also indicated that the area where the Taser struck him was sore. [Exhibit M at 8:30-9:30]. Daniels told Cornman that he suffered "scratches" from the incident. [Exhibit M at 10:30-13].

**B. Plaintiff's Claims:**

Plaintiff Nicholas Daniels' eleven claims are as follows:

- Count I: Violation of Plaintiff's Fourth Amendment Right Against Unlawful Seizure through False Arrest and Imprisonment under 42 U.S.C. § 1983. Asserted against Officers Terranova, Corcoran, and Sinclair.
- Count II: Violation of Plaintiff's Fourth Amendment Right Against Unlawful Seizure through Excessive Force under 42 U.S.C. § 1983. Asserted against Officers Terranova, Corcoran, and Sinclair.
- Count III: Violation of Plaintiff's Eighth Amendment Right Against Cruel and Unusual Punishment under 42 U.S.C. § 1983. Asserted against Officers Terranova and Sinclair.
- Count IV: Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection of the Law under 42 U.S.C. § 1983. Asserted against Officer Corcoran.
- Count V: Civil Conspiracy under 42 U.S.C. § 1985 to Deprive Plaintiff of his Fourth and Fourteenth Amendment Rights. Asserted against Sergeant Cornman and Officers Terranova, Corcoran, and Sinclair.
- Count VI: Failure to Train, Supervise, and Discipline Officers to Prevent Violation of Plaintiff's Constitutional Rights under 42 U.S.C. § 1983. Asserted against Chief Burton and the City.
- Count VII: Battery under Missouri law against Officers Terranova, Corcoran, and Sinclair.
- Count VIII: Conspiracy to Commit Battery under Missouri law against Officers Terranova and Corcoran.
- Count IX: False Imprisonment under Missouri law against Officers Terranova, Corcoran, and Sinclair.
- Count X: Malicious Prosecution under Missouri law against Sergeant Cornman and Officers Terranova, Corcoran, and Sinclair.

7

- Count XI: Conspiracy to Maliciously Prosecute under Missouri law against Sergeant Cornman and Officers Terranova, Corcoran, and Sinclair.

## II. Discussion

### A. Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matshushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 573, 587 (1986). A movant is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The rule requires summary judgment to be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This defense "provides ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Amrine v. Brooks*, 522 F.3d 823, 831 (8th Cir. 2008). Thus, qualified immunity "allows officers to make reasonable errors so that they do not always err on the side of caution for fear of being sued." *Id.* Qualified immunity is decided by a court as a matter of law; it is not decided by a jury. *Bramblett v. City of Columbia*, 2016 WL 4136960, at *4 (8th Cir. Aug. 4, 2016).

8

### C. Count I – Wrongful Arrest

In Count I of his Complaint, Nicholas Daniels brings a 42 U.S.C. § 1983 claim against Officers Ryan Terranova, Patrick Corcoran, and Clint Sinclair ("the Officers"), alleging their violation of his Fourth Amendment right to be free from "unlawful seizure through false arrest and imprisonment."[8] [Doc. 1, p. 12]. The Officers moved for summary judgment, asserting that their arrest of Daniels was supported by probable cause, and even if it was not, they are entitled to qualified immunity.

Probable cause exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person to believe that the arrestee had committed or was committing a crime. *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000). Whether an officer had probable cause to arrest requires a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant. *Whren v. U.S.*, 517 U.S. 806, 813 (1949). "Cognizant that police officers operate in the real world, often in rapidly unfolding and even chaotic circumstances, we view the facts not as an omniscient observer would perceive them but . . . as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he saw, hearing what he heard." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 714 (7th Cir. 2013) (internal quotation marks removed).

Daniels was charged with three crimes: (1) resisting arrest under Mo. Rev. Stat. § 575.150, (2) assault of a law enforcement officer under Mo. Rev. Stat. § 565.030, and (3) first-

---

[8] For the first time in his response to Defendants' motion for summary judgment, Daniels raises a new cause of action: a substantive due process fabrication of evidence claim under the Fourteenth Amendment. Daniels argues the Officers are not entitled to summary judgment on Count I because "genuine issues of material fact exist as to whether Defendant Terranova manufactured false evidence against Mr. Daniels in violation of the Fourteenth Amendment." [Doc. 54, p. 83]. In response, Defendants argue that the Court should not consider this claim because it was not raised in Daniels' Complaint and is not properly before the Court. The Court agrees and does not consider this new claim. Furthermore, in light of the video evidence surrounding Daniels' arrest, the Defendants likely would be entitled to summary judgment on this claim even if the Court did consider it.

degree trespass under Mo. Rev. Stat. § 569.140. The first question is whether the Officers needed probable cause to carry out an arrest for each of these crimes or only one of them. The Eighth Circuit answered that question in *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000). So long as probable cause existed to arrest Daniels for one offense arising out of the incident, the Officers' mistaken belief that they had probable cause to arrest for other offenses is immaterial. *See id.* (citing *Arnott v. Mataya*, 995 F.2d 121, 124 n.3 (8th Cir. 1993)). Whether Daniels was informed of the basis for his arrest is also irrelevant. *See Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required."). Accordingly, the Court considers whether the Officers had probable cause to arrest Daniels for any single crime.[9]

Under Missouri law, a person commits the crime of resisting arrest "if, knowing that a law enforcement officer is making an arrest, or attempting to lawfully detain or stop an individual . . . for the purpose of preventing the officer from effecting the arrest, stop or detention, [he] [r]esists the arrest, stop or detention . . . by using or threatening the use of violence or physical force or by fleeing from such officer." Mo. Rev. Stat. § 575.150 (Cumm. Supp. 2016).

The undisputed facts in this case would warrant a reasonable, prudent person to believe that Daniels was committing the crime of resisting arrest. The Officers' body cameras depict a chaotic scene involving quick movements and multiple peoples' limbs tangled around one another. The Officers were dressed in uniform, and they announced their presence to Daniels and Gettemeier multiple times. Daniels admitted that he knew the Officers were police during

---

[9] Because the Court finds the Officers had probable cause for resisting arrest, the Court need not consider whether there was probable cause for the other two crimes.

the incident, and it was not unreasonable for the Officers to believe Daniels was aware of their status.

When German arrived at the altercation, she ordered Daniels to put his arms behind his back, but he did not comply. Corcoran tried to pull one of Daniels' arms down, but Daniels tensed his arms. Officers ordered Daniels to get on the ground, but again, Daniels did not comply. Immediately thereafter, Sinclair was punched in the face. Daniels then broke away from the altercation with his hands at his sides and began walking away. Even after being stunned by Sanders' Taser, Daniels physically resisted Corcoran and Terranova's efforts to handcuff his arms behind his back. Finally, each of the Officers perceived that Daniels maintained muscular tension during the course of the altercation, which prevented them from controlling his movement.

Although Daniels had his arms raised at several moments during the encounter with the Officers, this action does not negate the Officers' probable cause to believe that he was resisting. An objective officer in their position could reasonably believe that Daniels was resisting when he kept his arms in the air because they were ordering him to do the opposite, and they were physically attempting to pull his arms down. Further, probable cause does not require a finding that Daniels was in fact using physical force to resist arrest; probable cause merely requires that the Officers' belief was objectively reasonable under the circumstances.

Daniels argues that there could not be probable cause to arrest him because the Officers did not do an investigation after the incident to determine if there was a reason to arrest Daniels. Daniels cites *Kuehl v. Burtis* in support of that argument, but it is factually distinguishable. 173 F.3d 646 (8th Cir. 1999). In *Kuehl*, the Eighth Circuit found "probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." *Id.* at 650. There,

Case 2:15-cv-04187-NKL   Document 86   Filed 10/26/16   Page 11 of 23

the officer did not witness any of the events leading to Kuehl's arrest. *Id.* at 648-49. Despite having no personal knowledge of what had transpired, the officer arrested Kuehl after speaking with him for just twenty seconds and refusing to listen to the only witness who saw what happened. *Id.* at 648-49.

In contrast, the Officers in this case were present during Daniels' violation of the law, and they observed Daniels' resistance. Even *Kuehl* recognizes that officers "need not conduct a 'mini-trial' before making an arrest." *Id.* at 650. Accordingly, the Officers had no duty to conduct further investigation before arresting Daniels. *See Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008) ("As probable cause is determined at the moment the arrest [is] made, any later developed facts are irrelevant to the probable cause analysis for an arrest."). Based on the totality of the circumstances known to the Officers at the time, there was probable cause to arrest Daniels for resisting arrest.

Furthermore, even if officers arrest a suspect under the mistaken belief that they have probable cause to do so, the officers are entitled to qualified immunity if their mistake is objectively reasonable. *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013). The Eighth Circuit has characterized this inquiry as whether the officers had "arguable probable cause." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). Here, at a minimum, the Officers had arguable probable cause to arrest Daniels for resisting arrest. For example, any mistake as to who struck Officer Sinclair in this chaotic environment is objectively reasonable given Daniels' other actions, including his conduct after the blow.

For these reasons, summary judgment is granted for Corcoran, Terranova, and Sinclair on Count I.

### D. Count II – Excessive Force

Excessive force claims are evaluated under the reasonableness standard of the Fourth Amendment. *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). In evaluating an excessive force claim, "[n]ot every push or shove . . . violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them." *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009).

Accordingly, "[o]bjective reasonableness depends on the facts and circumstances of the case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 586. In addition, this determination is made "without regard to [the officer's] subjective intent or motivation." *Loch v. Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012). An officer's use of force is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Finally, the Court may also consider the extent of the arrestee's injuries in making its reasonableness determination. *Rohrbough*, 586 F.3d at 586.

Daniels brings his excessive force claims against Terranova, Corcoran, and Sinclair. First, he contends that Terranova and Corcoran used excessive force when they punched him, used knee strikes, and attempted a leg sweep. Second, Daniels alleges that Sinclair firing a Taser was excessive force. Daniels' alleged physical injuries include puncture marks from the Taser

probes and soreness in his armpit.[10]  [Doc. 54, p. 44; Doc. 70, p. 83].  The Court addresses the two contested uses of force, in turn.

### 1.  Officers Corcoran and Terranova

Corcoran and Terranova approached Daniels and Gettemeier immediately after observing them in a physical altercation.  The facts and circumstances confronting Terranova and Corcoran at this time reasonably suggested a tense, uncertain, and rapidly evolving situation.  Upon their approach, they observed Daniels reaching up toward Gettemeier's neck and then observed him with his arm around Gettemeier's neck.  Gettemeier was a bouncer with authority to control the Fieldhouse bar.  Further, Terranova and Corcoran witnessed Daniels' repeated failures to comply with officer orders.  For instance, they witnessed Daniels' refusal to comply with German's orders to put his hands behind his back.  Although Corcoran attempted to physically pull Daniels' left arm down, Daniels pushed it back into the air.  The two officers also witnessed Daniels' failure to comply with officer orders to freeze and get down on the ground; Daniels remained standing.

These facts coupled with the dark,  loud atmosphere at the Fieldhouse all contributed to the confusing and uncertain nature of their interaction with Daniels.  Faced with a 230-pound man physically resisting their efforts to pull his arms behind his back, as well as refusing to comply with their orders to get on the ground, the two officers applied knee strikes, punches, and leg sweeps without success.  An objective police officer confronting similar facts and circumstances could reasonably conclude that he needed to exercise this physical force to try to gain control of the situation.

---

[10] Daniels also alleges that he "experienced tingling throughout his body, and suffered various lacerations and contusions to his body . . . and los[t] feeling in his hands" due to the handcuffs.  [Doc. 70, p. 83, ¶ 129].  These particular injuries, however, are not properly supported by the record.  *Id.*  Even if they were supported, these injuries would not change the outcome of the excessive force claim against Corcoran and Terranova.

14

Daniels' reliance on *Rohrbough v. Hall* is unpersuasive. *Rohrbough*, 586 F.3d 582 (8th Cir. 2009). In *Rohrbough*, an officer was called to a store about a possible theft. *Rohrbough* v. Hall, 586 F.3d 582, 586 (8th Cir. 2009). Upon seeing the suspect in the street just outside of the store, the officer commanded him to stop, and the suspect responded by turning around and greeting the officer. *Id.* Without provocation, the officer shoved the suspect who responded by shoving the officer back. *Id.* The officer retaliated by punching him in the face and wrestling him to the ground, causing severe injuries to the man's eye, ribs, and face, which required three days in the hospital. *Id.* The Eighth Circuit affirmed the district court's denial of summary judgment on this claim, holding that the reasonableness of the officer's forceful reaction to the arrestee's push was a matter for the jury. *Id.* at 587. In affirming the district court's denial of qualified immunity, the Eighth Circuit reasoned that "a reasonable officer, when faced with the present circumstances, would have known that responding by punching [the man] in the face, taking him to the ground face down, landing on top of him, and thereby causing him serious injury was illegal." *Id.*

In contrast to Daniels' situation, the arrest in *Rohrbough* did not take place in a dark, noisy environment like the Fieldhouse but rather, in the street outside of a store. Also, the *Rohrbough* arrestee was not in a physical altercation when the police officer approached. Further, unlike Daniels' situation, the officer's use of force in *Rohrbough* sent the arrestee to the hospital for three days with injuries far more serious than Daniels' bruises and scratches.

Finally, the Court has been instructed by higher courts that a judge should be "hesitant to second-guess the split-second judgments of officers working in tense, uncertain, and rapidly evolving situations." *Aipperspach v. McInerney*, 766 F.3d 803, 806 (8th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)) (internal quotation marks removed). The

15

confusing, crowded, dark scene at the Fieldhouse is just such an uncertain situation. Although reviewing the thirty seconds of video frame by frame in the calm aftermath makes it appear that, arguably, Terranova and Corcoran could have taken a different course of action than the physical force they chose to impose on Daniels, the police are not held to such a demanding standard by the Eighth Circuit and the U.S. Supreme Court. *Id.*

Because the force used was objectively reasonable under the circumstances, Corcoran and Terranova are entitled to summary judgment on Daniels' excessive force claim.

### 2. Officer Sinclair

Daniels also contends that Sinclair's use of a Taser was excessive force. Therefore, the Court evaluates this use of force in light of the facts and circumstances facing an objective officer in Sinclair's position. The undisputed facts show that as Sinclair turned in Daniels' direction, he experienced a punch to his face that forced his body sideways. An objective officer under these rapidly changing circumstances could reasonably perceive that Daniels had thrown the punch, even if Daniels did not throw the punch. After recovering from the blow, Sinclair turned back toward Daniels who was walking away from the altercation with his hands at his sides. Daniels was neither in handcuffs nor under the physical control of any officers. Rather, he was moving away from the officers. Faced with these facts, Sinclair shouted, "Taser, Taser, Taser!" and fired one time at Daniels' back. At the same time, Corcoran pulled Daniels' legs out from under him, and Daniels fell to the ground.

Without deciding whether the deployment of a Taser in these circumstances is a reasonable use of force, the Court finds that, regardless, Sinclair is entitled to qualified immunity. To overcome Sinclair's qualified immunity defense, Daniels must show that the clearly established law at the time of the incident would have put Sinclair on notice that firing a

16

Taser once at a suspect—a suspect he perceived had punched him, and was resisting arrest and walking away—was unmistakably illegal. *See Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) ("A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right.") (internal quotation marks omitted). Daniels does not provide any such authority.

Although Daniels makes a passing reference to *Brown v. City of Golden Valley* to support his excessive force claim, this case is distinguishable. *Id.* In *Brown*, the Eighth Circuit ruled that an officer violated clearly established rights in 2005 by using a Taser against "a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator." *Id.* at 499. In *Brown*, the officer Tased the plaintiff as she sat in the passenger seat of a car and spoke with a 911 operator. *Id.* at 496.

In contrast, Daniels was not sitting passively in the passenger seat of a car when Sinclair deployed his Taser; he was standing in a crowded, dark bar as officers attempted to detain him. Even accepting Daniels' version of the events that he did not punch Sinclair, it is undisputed that Sinclair experienced a punch to his face, which he could have reasonably perceived was thrown by Daniels, even if this perception was mistaken. An objective officer faced with this information could reasonably believe that Daniels was continuing to resist arrest.

Other cases in which the Eighth Circuit has found the defendant officer was not entitled to qualified immunity for using a Taser or shotgun are also distinguishable from Daniels' case. *See, e.g., Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012) (affirming district court's denial of qualified immunity where officer used his Taser on an unarmed suspected misdemeanant who did not resist arrest, did not threaten the officer, did not behave aggressively

17

towards him, and who informed officer that he was physically unable to place his arms behind his back because of his disability); *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008) (affirming district court's denial of qualified immunity where officer fired his gun at an unarmed man who was fleeing from the officers); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) (affirming district court's denial of qualified immunity where officer responded to a report that a single male had fired shots and arrived at the scene where two men were struggling for possession of a firearm and, without warning and while one of the men was holding the gun overhead and pointed upward to keep it away from the other man, the officer fired his shotgun in a way that a trained shooter would know would hit both men, including the presumed victim).

In light of the circumstances facing Sinclair, the Court cannot find that his firing a Taser one time at Daniels was clearly illegal under the Constitution in October of 2013. Therefore, Sinclair is entitled to qualified immunity. For these reasons, summary judgment is granted for Terranova, Corcoran, and Sinclair on Daniels' Count II excessive force claims.

### E. Count III – Cruel and Unusual Punishment

Daniels alleges that Terranova and Sinclair violated his Eighth Amendment rights to be free from cruel and unusual punishment by using a Taser on him.[11] The Supreme Court has made clear "that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Furthermore, the Eighth Amendment's protections do not attach until after conviction. *Whitley v. Albers*, 475 U.S. 312, 327 (1986).

In support of summary judgment, Terranova and Sinclair argue that the only force used

---

[11] The undisputed facts show that Terranova did not use a Taser on Daniels. Sinclair is the only officer who deployed his Taser, firing one time.

18

against Daniels occurred during his arrest at the Fieldhouse, and Daniels was not convicted of any of the charges arising from the incident. Accordingly, Daniels' excessive force claims cannot be analyzed under the Eighth Amendment. Daniels has not contested any of these arguments. Therefore, Terranova and Sinclair are entitled to summary judgment on Daniels' Eighth Amendment claim.

### F.  Count IV – Equal Protection

The Equal Protection Clause of the Fourteenth Amendment "prohibits government officials from selectively applying the law in a discriminatory way." *Brandt v. Davis*, 191 F.3d 887, 893 (8th Cir. 1999). Accordingly, in general terms, "the Equal Protection Clause requires that state actors treat similarly situated people alike." *Habhab v. Hon*, 536 F.3d 963 (8th Cir. 2008). "State actors may, however, treat dissimilarly situated people dissimilarly without running afoul of the protections afforded by the clause." *Id.* Therefore, as a threshold matter, a plaintiff must show that he was treated differently than other persons who were "in all relevant respects similarly situated" because he belongs to a particular protected class. *Flowers v. Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009).

In Count IV, Daniels alleges that Corcoran violated his Fourteenth Amendment rights by targeting him because of his race. In support, he contends that, during the physical altercation with Gettemeier, Corcoran treated Daniels differently by using physical force against him but not against Gettemeier, a white male. He further alleges that Corcoran's conduct was racially motivated because, prior to the incident, Corcoran yelled to Gettemeier that there were a lot of "players" in the bar and that there was "probably a gun or two."[12] Daniels contends that the

---

[12] In his briefing, Daniels also contends that Corcoran treated him differently by ordering him to "Stay back!" as Daniels was walking behind Corcoran. [Doc. 54, p. 90]. He alleges that "numerous other white people were in closer proximity to Officer Corcoran at the time," including a "tall white male [who] cut between the two officers." [Doc. 54, p. 90]. Because Daniels fails to support these allegations with any

"players" comment was racial profiling.

Even assuming that Corcoran's comment is indicative of racial profiling, Daniels cannot establish that he was similarly situated in all relevant respects to Gettemeier. Rather, the undisputed facts show that Daniels was a bar patron, and Gettemeier was a Fieldhouse bouncer. It is also undisputed that Corcoran knew of Gettemeier's status as a Fieldhouse bouncer prior to and at the time of the altercation with Daniels. Therefore, Daniels' Fourteenth Amendment claim is an example of a state actor "treat[ing] dissimilarly situated people dissimilarly," which does not run afoul of the Equal Protection Clause. As a bouncer, Gettemeier had authority to eject patrons from the bar; Daniels did not.

Summary judgment is granted for Corcoran on Count IV.

### G. Count V – Conspiracy Under Section 1985

In Count V of his Complaint, Daniels alleges that Cornman,[13] Terranova, Corcoran, and Sinclair conspired under 42 U.S.C. § 1985[14] to deprive him of his Fourth and Fourteenth Amendment rights "by agreeing together to write false police reports regarding their assault and arrest of Plaintiff, and by delivering such reports to the Boone County Prosecutor's Office." [Doc. 1, p. 18].

To state a claim under § 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the

---

facts or evidence from the record, the Court does not consider this argument. *See Ballard v. Heineman*, 548 F.3d 1132, 1135 (8th Cir. 2008) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.").

[13] In his Complaint, Daniels named Cornman as a defendant to his Count V conspiracy charge. [Doc. 1, p. 18]. However, in his briefing, Daniels did not allege any facts or argument specific to Cornman's involvement in the alleged conspiracy. Thus, the Court grants summary judgment as to Cornman.

[14] In his briefing, Daniels discusses for the first time a conspiracy claim under 42 U.S.C. § 1983. [Doc. 54, p. 91]. Because a § 1983 conspiracy claim was not properly pled in his Complaint, the Court does not address it. Furthermore, as already discussed, Daniels has failed to show an underlying violation of any of his constitutional rights, and thus, even if the Court did consider this claim, it would fail. *See White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) ("The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim.")

20

purpose of depriving another of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to a person or property, or the deprivation of a legal right." *Federer v. Gephardt*, 363 F.3d 754, 757-58 (8th Cir. 2004). In addition, the plaintiff "must allege that an independent federal right has been infringed. Section 1985 is a statute which provides a remedy, but it grants no substantive stand-alone rights. The source of the rights or laws violated must be found elsewhere." *Id.* at 758. To support his conspiracy claim, Daniels contends that two independent federal rights were infringed: (1) his Fourth Amendment rights to be free from unlawful seizure, and (2) his Fourteenth Amendment rights to due process. [Doc. 54, p. 91].

As discussed above, Daniels failed to prove any infringement of his Fourth Amendment rights, either with respect to his arrest or the associated use of force. Therefore, his claim of a § 1985 conspiracy to violate his Fourth Amendment rights fails.

To support his claim of a § 1985 conspiracy to violate his Fourteenth Amendment due process rights, Daniels contends that the Officers "fabricate[d] evidence." [Doc. 54, p. 92]. He alleges that the Officers met at the police station with the purpose of ironing out a story to "cover up" their unlawful arrest of him and their use of excessive force. [*Id*]. He further contends that the Officers then falsified their police reports.

As previously discussed, Daniels failed to prove any underlying infringement of his constitutional rights under the Fourth Amendment, and thus, there was no unlawful arrest or use of excessive force for the Officers to "cover up" in violation of the Fourteenth Amendment. Furthermore, Daniels fails to ground the previous allegations with evidence from the record. He does not provide evidence that the Officers met at the police station for the purpose of covering up the arrest and use of force, nor does he provide evidence that the police reports were falsified.

*See Ballard v. Heineman*, 548 F.3d 1132, 1135 (8th Cir. 2008) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment."). Indeed, most of the incident is recorded on officer body cameras, and Daniels has not challenged the authenticity of those cameras.

For these reasons, summary judgment is granted on Daniels' Fourth Amendment and Fourteenth Amendment conspiracy claims.

### H. Count VI – Failure to Train, Supervise, and Discipline Officers

In Count VI, Daniels' § 1983 claims against Chief Burton and the City of Columbia[15] are based upon alleged failures to train and supervise Columbia Police Department Officers, as well as policies or customs that gave rise to alleged violations of Daniels' constitutional rights. "This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *Moore v. City of Desloge*, 647 F.3d 841, 849 (8th Cir. 2011) (citing *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005)). "Similarly, to maintain an action for training or supervisory liability, a plaintiff must show the failure to train or supervise caused the injury." *Id.* Because Daniels failed to establish that Corcoran, Terranova, or Sinclair violated any of his constitutional rights, he cannot maintain his action against either Burton or the City. Summary judgment is granted on Count VI.

### I. Counts VII, VIII, IX, X, and XI – Missouri State Law Claims

Daniels brings five additional claims under Missouri state law: Count VII and VIII for battery and conspiracy to commit battery, Count IX for false imprisonment, and Count X and XI

---

[15] For the first time in his briefing, Daniels alleges that Cornman is also liable under his § 1983 claims in Count VI. However, Daniels did not name Cornman as a defendant to Count VI in his Complaint. [Doc. 1, p. 19]. Therefore, any claims against Cornman were not properly pled and are not considered by the Court.

22

for malicious prosecution and conspiracy to maliciously prosecute.

"Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c)(3) to dismiss supplemental state law claims when all federal claims have been dismissed." *Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006). Because the Court has granted summary judgment on all federal claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Daniels' state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [i]f the district court has dismissed all claims over which it has original jurisdiction."). Therefore, the Court dismisses these claims without prejudice.

## III.    Conclusion

For these reasons, Defendants' motion for summary judgment, [Doc. 38], is granted in part. Summary judgment is granted for Defendants on Counts I, II, III, IV, V, and VI. In its discretion, the Court declines to exercise supplemental jurisdiction over Counts VII, VIII, IX, X, and XI. Accordingly, Counts VII, VIII, IX, X, and XI are dismissed without prejudice.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated:  October 26, 2016
Jefferson City, Missouri

Case 2:15-cv-04187-NKL   Document 86   Filed 10/26/16   Page 23 of 23